Eric I. Abraham (eabraham@hillwallack.com)
Kristine L. Butler (kbutler@hillwallack.com)
**HILL WALLACK LLP**
21 Roszel Road
Princeton, New Jersey 08543-5226
(609) 734-6358

*Of Counsel:*
Robert Cerwinski (*pro hac vice to be filed*)
C. Kyle Musgrove (*admitted pro hac vice*)
Heather M. Schneider (*admitted pro hac vice*)
Cindy Chang (*admitted pro hac vice*)
Jason Zaccaro (*admitted pro hac vice*)
Julia Schur (*admitted pro hac vice*)
**GEMINI LAW LLP**
32 W 39th Street
New York, NY 10018

*Attorneys for Defendants*
*Xiromed Pharma España, S.L. and*
*Xiromed, LLC*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MERCK SHARP & DOHME B.V., N.V. ORGANON, ORGANON USA LLC, and ORGANON LLC,<br><br>        Plaintiffs,<br><br>    v.<br><br>XIROMED PHARMA ESPAÑA, S.L. and XIROMED, LLC,<br><br>        Defendants. | Civil Action No. 2:25-cv-02254-CCC-LDW<br><br>*Document Electronically Filed* |

**<u>DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO DISMISS
COUNTERCLAIM AND STRIKE AFFIRMATIVE DEFENSE OF
INEQUITABLE CONDUCT</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................... i

TABLE OF AUTHORITIES ............................................................... ii

INTRODUCTION ............................................................................... 1

FACTUAL BACKGROUND ............................................................... 3

LEGAL STANDARDS ...................................................................... 10

ARGUMENT .................................................................................... 14

I.       XIROMED'S COUNTERCLAIM SUFFICIENTLY PLEADS THE WHO, WHAT, WHERE, WHEN, WHY AND HOW OF MERCK'S INEQUITABLE CONDUCT. .................................................................. 14

    A.    "Who" Committed Inequitable Conduct ......................................... 14

    B.    "What" Claims Were Impacted and "Where" the Material Misrepresentations and Omissions Were Found ............................ 16

    C.    "When" the Material Misrepresentations and Omissions Occurred 20

    D.    "Why" the Information Is Material and "How" the Examiner Would Have Used It ...................................................................... 21

II.      MERCK'S COUNTERARGUMENTS GO TO THE MERITS OF XIROMED'S INEQUITABLE CONDUCT COUNTERCLAIM, NOT THE SUFFICIENCY OF XIROMED'S PLEADING. ............................... 27

III.     MERCK'S MISREPRESENTATION'S ABOUT THE PRIOR ART ARE NOT MERE "ATTORNEY ARGUMENT" AND SUPPORT AN INEQUITABLE CONDUCT CLAIM. ............................................. 33

CONCLUSION .................................................................................. 38

# TABLE OF AUTHORITIES

## Cases

*Am. Calcar, Inc. v. Am. Honda Motor Co*., 768 F.3d 1185
(Fed. Cir. 2014) .......................................................................28, 32, 37

*American Regent, Inc. v. Somerset Therapeutics, LLC*, No. 24-cv-01022,
2025 WL 2318989 (D.N.J. Aug. 12, 2025) (unpublished) ....................13, 27, 31

*Apotex, Inc. v. UCB, Inc.*, 763 F.3d. 1354 (Fed. Cir. 2014) ....................................28

*Bausch Health Ireland Ltd. v. Padagis Israel Pharmaceuticals Ltd.,*
No. 20-cv-05426 (SRC/CLW), 2021 WL 4593271 (D.N.J. Oct. 6, 2021). .......11

*Catalyst Pharms., Inc. v. Jacobus Pharms. Co.*, No. 20-14590 (MAS/DEA),
2022 WL 22897850 (D.N.J. May 26, 2022) ......................................................35

*Cottrell v. Family Practice Assocs.*, No. 15-2267 (NLH/KMW),
2016 WL 1700534 (D.N.J. Apr. 28, 2016) ........................................................11

*Depomed, Inc. v. Purdue Pharma L.P.*, No. 13-571, 2017 WL 2804953
(D.N.J. June 28, 2017) ...........................................................................12, 13, 27

*Enzo Life Sciences, Inc. v. Digene Corp.*, 270 F. Supp. 2d 484
(D. Del. 2003) ..............................................................................................33, 34

*Exergen Corp. v. Wall-Mart Stores, Inc.*, 575 F.3d 1312
(Fed. Cir. 2009) .............................................................................10, 11, 12, 14

*Fresenius Kabi USA, LLC v. Fera Pharms.*, No. 15-cv-03654 (KM/MAH),
2016 U.S. Dist. LEXIS 128126 (D.N.J. Sept. 20, 2016) .................12, 13, 16, 38

*Luv N' Care, Ltd. v. Laurain*, 98 F.4th 1081 (Fed. Cir. 2024) ....................28, 32, 33

*Mars Inc. v. JCM American Corp.*, No. 05-3165, 2006 WL 1704469
(D.N.J. June 14, 2006) ......................................................................................13

*Nilssen v. Osram Sylvania, Inc.,* 504 F.3d 1223 (Fed. Cir. 2007) ....................33, 37

*Semiconductor Energy Lab'y Co. v. Samsung Elecs. Co.*, 204 F.3d 1368
(Fed. Cir. 2000) .................................................................................................37

*Seville Industrial Machinery Corp. v. Southmost Machinery Corp*, 742 F.2d 786
　　(3d Cir. 1984)......................................................................................11

*Warner Chilcott Co., LLC v. Amneal Pharmaceuticals, LLC*,
　　2013 WL 6627694 (D.N.J. Dec. 20, 2013)...........................................................

# INTRODUCTION

Merck's motion to dismiss Xiromed's inequitable conduct counterclaim should be denied.  Xiromed understands the seriousness of pleading inequitable conduct.  But the misconduct by Merck's prosecuting attorneys and named inventors set forth in Xiromed's counterclaims is serious: had these individuals been candid with the Patent Office about the obviousness of the '037 patent claims, the patent never would have issued.  Their lack of candor—in defiance of their obligations to the Patent Examiner and the public—is exactly the kind of gamesmanship that the inequitable conduct doctrine is intended to dissuade.  While Merck understandably wants to avoid judicial scrutiny of this misconduct, Xiromed's allegations deserve to be heard on the merits, not quashed at the pleadings stage.

Contrary to Merck's assertions, Xiromed's counterclaim is pled with particularity, setting forth the who, what, where, when, why, and how of the inequitable conduct.  As the counterclaim explains, all that Merck did to develop and patent the NEXPLANON contraceptive implant was add a radio-opaque material called barium sulfate to its old, prior-art IMPLANON contraceptive implant so that the new implant was visible in the body.

In allowing the claims of the '037 patent the Examiner relied on Merck's assertion that there was a lack of art demonstrating the incorporation of radio-opaque material into a contraceptive implant.  Conversely, when Merck wanted to argue that

1

another party's patents were invalid, it took exactly the opposite approach—asserting that a person of ordinary skill in the art would have been motivated to combine the contraceptive implant described by De Nijs, the primary prior art reference asserted against the '037 patent, with art describing the addition of radio-opaque materials to such implants, and that a person of ordinary skill in the art ("POSA") **would have expected success with this combination**. Additionally, Merck's attorneys and named inventors materially misrepresented and omitted other key prior art in obtaining allowance of the '037 patent.

Furthermore, at this stage all factual statements asserted in the Amended Counterclaims and derivable from the Exhibits to those Counterclaims are treated as true and interpreted in the light most favorable to Xiromed. Much of Merck's motion is an attempt to argue against the substance of the inequitable conduct claim itself, including how prior art should be interpreted and other factual and expert matters. But those questions go to the merits, not whether Xiromed adequately pled its claim. The Court does not have to decide right now whether Xiromed's allegations are true, only whether they are sufficiently pled to remain in the case.

Finally, Merck argues that its misrepresentations and omissions were merely "attorney arguments" that are insulated from inequitable conduct. That is not true. The statements that Merck's attorneys and named inventors made were factual statements about prior art to an Examiner who had rejected Merck's application and

reached out for clarification. Misrepresentations about the prior art are not mere "arguments" and can support findings of inequitable conduct under the law.

Merck's motion should be denied. Even if the Court were to grant Merck's motion, it should be done without prejudice to Xiromed refiling after further discovery.

## FACTUAL BACKGROUND

U.S. Patent No. 8,722,037 ("the '037 patent"), entitled "X-Ray Visible Drug Delivery Device," issued on May 13, 2014. (Complaint for Patent Infringement ("Complaint"), ECF No. 1 at ¶¶ 34-37.) Merck Sharp & Dohme B.V. ("Merck") purports to be the owner and assignee of the patent. (Complaint at ¶ 2.)

As explained in Defendants Xiromed Pharma España, S.L. and Xiromed, LLC's Amended Answer, Separate Defenses, and Counterclaims (ECF No. 44, "Counterclaims") and associated Exhibits (ECF Nos. 44-1 to 44-19, "Exhibits"), the '037 patent is listed in the Orange Book for Plaintiffs' NEXPLANON product. (Counterclaims at ¶ 36; Exhibit 4.) The primary difference between NEXPLANON (and the claims of the '037 patent) and Plaintiffs' prior IMPLANON product (and the De Nijs reference cited during the '037 patent's prosecution) is the addition of a "radiopaque" (or radio-opaque) component, barium sulfate, to the core matrix of the implant rod so that the implant can be visualized in the body using x-rays.

3

(Counterclaims at ¶¶ 34, 37; Exhibit 9, Reasons for Allowance at 2.)[1]    The counterclaims assert that the claims of the '037 patent are unenforceable due to inequitable conduct. (Counterclaims at ¶ 29.) The counterclaims also assert that the individuals responsible for this inequitable conduct include at least the two named inventors Harm Veenstra and Wouter De Graaff and Merck's attorneys Susan Hess, Patricia Chisholm, and Janet Fair. (Counterclaims at ¶ 30.) Additional individuals responsible for overseeing the prosecution of the '037 patent may be involved as well, as further discovery may reveal.

The inequitable conduct includes a pattern of deliberate misrepresentations to the United States Patent & Trademark Office ("USPTO") as to the state of and teachings of the prior art, as well as failure to disclose material prior art. (Counterclaims at ¶ 31.) More particularly, Merck's attorneys and named inventors took the position during prosecution of the '037 Patent that it would ***not*** have been obvious to incorporate a radiopaque substance into a long-acting contraceptive device for use in a human. (Counterclaims at ¶¶ 32, 38.) Then, Merck took the exact ***opposite*** position in a petition for *inter partes* review ("IPR") of another company's patent, Microspherix. (Counterclaims at ¶¶ 32, 41, 44-45; Exhibit 11, Langer Declaration, at ¶¶ 128-149.) Both things cannot be true.

---

[1] The De Nijs reference consistently referred to during prosecution disclosed various information about the IMPLANON implant. (Counterclaims at ¶ 39.)

In this case, Merck's later statements prove that the earlier statements by Merck's attorneys and named inventors were false and misleading. The truth is that "[t]here is a long history of barium sulfate being added to contraceptive and/or hormone releasing devices to provide another mechanism, in addition to ultrasound and MRI, to locate the device inside a subject's body," as Merck's expert explained in his IPR declaration. (Counterclaims at ¶ 44; Exhibit 11, Langer Declaration, at ¶ 137.) The truth is also that a POSA would have been motivated to use a radiopaque marker in such an implant "because it was known in the art to use radiopaque markers both to allow for precise placement of implants and to track their location within the body," as Merck itself argued in the IPRs. (Counterclaims at ¶ 45; Exhibit 17, IPR2018-01288, Petition for *Inter Partes* Review at 58-59.) Additionally, a POSA would have reasonably expected success in generating such a radio-opaque version of IMPLANON, i.e., the implant claimed in the '037 patent.

Indeed, Merck affirmatively asserted as much through its expert in the IPR, Dr. Langer:

> 138. In light of [the long history of barium sulfate in various hormonal devices and Schopflin in particular], a ***POSA would have been motivated to include a x-ray visible radiopaque material such as barium sulfate***, as taught in Schopflin, to provide another mechanism for locating the implant within the subject's body when the implant was not readily palpable. As discussed above at Section VIII, ***radiopaque markers had been used to make implants visible by common imaging techniques in the art***.

> 139. ***A POSA would also have had a reasonable expectation that the teachings of De Nijs and Schopflin could be successfully combined because***

***they disclose implants with features that overlap heavily. De Nijs and Schopflin both teach cylindrical implants about 1.5 mm in diameter and 1 to 4 cm in length.*** Compare De Nijs at 1:62-67, 2:18-22 with Schopflin 9:4-22 (Example 3), 9:24-39 (Example 4) (describing cylindrical implants "of a length of 20 mm and a diameter of 1.5 mm"). Both teach the use of contraceptive hormones as the drug inside the implant. Compare De Nijs at 2:3-29 with Schopflin at 5:54-6:13. Both teach the use of a polymeric coating to cover the implant. Compare De Nijs at 1:34-36, 2:3- 20, 3:34-36 with Schopflin at 1:21-26, 7:2-4. Given the substantial overlap, ***a POSA would have an expectation that these references could be successfully combined*** to create a radiopaque device.

(Exhibit 11, Langer Declaration at ¶¶ 138-139) (emphasis added); *see, e.g.,* Counterclaims at ¶¶ 32, 40-48 (asserting that Merck's attorneys and named inventors took the position during prosecution of the '037 patent that it would not have been obvious to incorporate a radio-opaque substance into a contraceptive implant and took the exact opposite position during the Microspherix IPR and that the attorneys did not disclose material prior art (including Schopflin)); *see also* Counterclaims at ¶ 45 (quoting Exhibit 17, IPR2018-01288, Petition for *Inter Partes* Review at 58-59) ("'Second a POS working with De Nij's disclosure of a cylindrical hormone-eluting implant ***would have been motivated to incorporate Schopflin's teaching*** of including a radiopaque marker because it was known in the art to use radiopaque markers both to allow for precise placement of implants and to track their location within the body.'") (emphasis added).

Upon information and belief, Merck's attorneys and named inventors were aware of this "long history" and use of radiopaque markers, including the specific,

quoted citation to Schopflin's teaching of including radiopaque markers in implants, but they did not supply this information to the USPTO.  The '037 patent's current claims would not have issued "but for" their omission.  (Counterclaims at ¶¶ 47-48.)

In addition, Merck's attorneys and named inventors engaged in a pattern of misrepresentations about the prior art to convince the Examiner that, when the inventors took the admittedly-obvious step of adding barium sulphate—a radio-opaque substance commonly used in medical devices—to IMPLANON, the barium "unexpected[ly]" remained separate from the hormone active ingredient and became "encapsulated" in the polymer that forms the core of the implant  (Counterclaims at ¶¶ 51-52.)  This was material to patentability, because the patent claims require the implant to have a core with three elements:

(a) crystalline desogestrel or 3-ketodesogestrel;

(b) a thermoplastic polymer, wherein the percent weight of the thermoplastic polymer in the core is equal to or less than the percent weight of the desogestrel or 3-ketodesogestrel; and

(c) about 4-30% by weight of a radio-opaque material, *wherein substantially all the radio-opaque material is encapsulated in the thermoplastic polymer and not in the crystalline desogestrel or 3-ketodesogestrel*

('037 patent, claim 1.)  Merck's attorneys and named inventors told the Examiner that a person of skill in the art would *not* have expected the barium sulfate to be encapsulated in the thermoplastic polymer in the core but instead would have expected it to be encapsulated in the crystal and leach out along with the drug.  (Counterclaims at ¶ 53.)  This, according to Merck's attorneys and named inventors,

7

could lead to significant health issues, because toxic barium could supposedly leach out into the patient over time. (Counterclaims at ¶ 52; Exhibit 7 at 7-8; Exhibit 12 at 7.) On information and belief, however, Merck's attorneys and named inventors knew this was false and misleading. Upon information and belief, Merck's attorneys and named inventors were aware that in an implant such as the one claimed, the addition of barium sulfate would necessarily be encapsulated by the polymer matrix and not in the crystalline drug. (Counterclaims at ¶ 56.) On information and belief, they were aware of the prior art Van Laarhoven 2002 reference, as it was authored by a Merck employee and cited during prosecution of the '037 patent for a different, misleading, proposition. (*Id.* at ¶ 57.)

In addition, Merck's attorneys and named inventors argued to the Examiner that a POSA would expect the radio-opaque substance in the core to affect the release of the drug. (Counterclaims at ¶ 59.) But they cited no evidence that this effect would occur in "reservoir"-type implants like IMPLANON, in which drug release is controlled by the polymer membrane (or "skin") surrounding the core. Rather, the art and arguments that Merck's attorneys and named inventors raised related to "matrix" devices, in which drug release is controlled by the components of the core of the implant, rather than the membrane. (*Id.* at ¶¶ 59-60.) Thus, Merck's attorneys and named inventors misled the examiner by mischaracterizing the relevance of this unrelated prior art. (*Id.* at ¶¶ 60-65.)

8

That Merck's attorneys and named inventors were conjuring self-serving expectations of problems where none existed is clear from the later sworn statements of Merck's IPR expert Dr. Langer, who—long after Merck safely secured issuance of the '037 patent—explained that a POSA both **would have been motivated to combine contraceptive implants with barium sulfate and would have expected success** in combining IMPLANON with barium sulfate.  In the IPR, Dr. Langer opined that a POSA "would have an expectation that these references [De Nijs and Schopflin] could be successfully combined to create a radiopaque device."  (Exhibit 11 at ¶ 139; *see also* Counterclaims at ¶ 32, 44-45 (pointing to De Nijs and Schopflin).) Relying on Dr. Langer, Merck's attorneys candidly stated that

> Because Schopflin teaches that a radiopaque marker can successfully be incorporated into a similarly-designed drug-releasing contraceptive implant, a POSA would have an expectation that radiopaque marker of Schopflin [e.g. barium sulfate] could be successfully combined with the De Nijs implant [e.g. IMPLANON].

(Exhibit 17 at 60; *see also* Counterclaims at ¶ 45.)  Conspicuously absent from these statements are any alleged expectations that such a combination would poison patients with toxic barium sulphate, as they had convinced the Examiner of the '037 patent.  (Exhibit 9, Reasons for Allowance at 2.)

Interestingly, Merck's Motion to Dismiss nowhere addresses the undisclosed Schopflin reference that Dr. Langer directly used to demonstrate both a motivation to combine and a reasonable expectation of success despite the quotation of a portion

9

of Merck's IPR Petition directly calling out that reference by name. (Counterclaims at ¶¶ 45-47.) Instead, Merck continues to ignore it; just as it did during the prosecution of the '037 patent. For example, Merck does not cite Schopflin at all in the table of prior art it says is cumulative. (Plaintiffs' Motion to Dismiss Defendants' Counterclaim and Strike Affirmative Defense of Inequitable Conduct ("Motion"), ECF No. 50-1 at 25-27.) This is a glaring omission.

But for the intentional misrepresentations of the prior art by Merck's attorneys and named inventors to the USPTO, the '037 Patent's claims would not have been allowed. (Counterclaims at ¶ 66.) Taken together, Merck's attorneys' and named inventors' pattern of conduct, including knowing omission of material prior art, and multiple knowing misrepresentations of the prior art, demonstrate evidence of specific intent to deceive the USPTO to gain allowance of the '037 patent. (*Id.* at ¶ 67.) This pattern is laid out with particularity, and Xiromed expects to learn even more once discovery is undertaken.

## LEGAL STANDARDS

The Federal Circuit has held that, to satisfy Rule 9(b), an inequitable conduct pleading must indicate the who, what, when, where, why, and how of the alleged fraud. *Exergen Corp. v. Wall-Mart Stores, Inc.*, 575 F.3d 1312, 1328 (Fed. Cir. 2009). Pleading on "information and belief" is permitted under Rule 9(b) when essential information lies uniquely within another party's control, so long as the

pleading sets forth the specific facts upon which the belief is reasonably based.  *Id.* at 1330.  "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior."  *Seville Industrial Machinery Corp. v. Southmost Machinery Corp*, 742 F.2d 786, 791 (3d Cir. 1984).  Moreover, in considering a motion to dismiss, the Court considers "the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Cottrell v. Family Practice Assocs.*, No. 15-2267 (NLH/KMW), 2016 WL 1700534, at *2 (D.N.J. Apr. 28, 2016) (citing *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010)).

The "who" element requires naming specific individuals that knew of the material information and deliberately misrepresented it.  *Exergen*, 575 F.3d at 1329.

The "what" and "where" elements require identifying which claims and claim limitations the misrepresentation or omission is relevant to and where in the misrepresented or omitted prior art the material information is found.  *Id.* at 1329.

The "when" requirement refers to when during the prosecution the misrepresentations or omissions were made.  *Bausch Health Ireland Ltd. v. Padagis Israel Pharmaceuticals Ltd.,* No. 20-cv-05426 (SRC/CLW), 2021 WL 4593271, at *4 (D.N.J. Oct. 6, 2021).

The "why" and "how" elements of the inequitable conduct claim are satisfied by explaining why the misrepresented or omitted information is material and not cumulative, and how an examiner would use that information in determining the patentability of the claims. *Exergen*, 575 F.3d at 1329-30.

There are two additional elements to establishing a claim of inequitable conduct, intent and materiality. "At the pleading stage, the proponent of the inequitable conduct theory need only plead facts supporting a reasonable inference that a specific individual '(1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.'" *Depomed, Inc. v. Purdue Pharma L.P.*, No. 13-571, 2017 WL 2804953, at *4 (D.N.J. June 28, 2017) (citing *Exergen*, 575 F.3d at 1328-29).

"The standards for ***pleading*** a claim of inequitable conduct are more lenient than the standards for ***obtaining relief***." *Id.* (emphasis added); *see also Fresenius Kabi USA, LLC v. Fera Pharms.*, No. 15-cv-03654 (KM/MAH), 2016 U.S. Dist. LEXIS 128126, at *30 (D.N.J. Sept. 20, 2016) (explaining that courts in this District have held that *Exergen* applies at the pleading stage) (citations omitted). At this stage, deceptive intent need only be a reasonable inference rather than the single most reasonable inference. *Depomed*, 2017 WL 2804953, at *4. A reasonable

12

inference is "one that is plausible and that flows logically from the facts alleged." *Id.* (citation omitted).

In addition, "the issue here is not whether Defendants have sufficiently proven the elements of inequitable conduct, but rather whether the Defendants have sufficiently pleaded their inequitable conduct counterclaim and defenses such that those claims and defenses should withstand a Rule 12 challenge." *Mars Inc. v. JCM American Corp.*, No. 05-3165, 2006 WL 1704469, at *5 (D.N.J. June 14, 2006). "A factual disagreement cannot support dismissal of [Xiromed's] counterclaim at the pleading stage." *Depomed*, 2017 WL 2804953 at *6. Pleading "that various persons associated with [the] patent prosecution" made misrepresentations that went to the "very heart of the patent" is enough to meet "the relatively low threshold of being a sufficient allegation." *Fresenius*, 2016 U.S. Dist. LEXIS 128126, at *31.

Finally, "[i]n evaluating the sufficiency of a counterclaim, district courts must separate the factual and legal elements. *American Regent, Inc. v. Somerset Therapeutics, LLC*, No. 24-cv-01022, 2025 WL 2318989, at *5 (D.N.J. Aug. 12, 2025) (unpublished). "A court must accept all of the counterclaim's well pleaded facts as true and give a defendant the benefit of all reasonable inferences flowing therefrom." *Id.* (citation, internal quotations, and brackets omitted).

## ARGUMENT

## I. XIROMED'S COUNTERCLAIM SUFFICIENTLY PLEADS THE WHO, WHAT, WHERE, WHEN, WHY AND HOW OF MERCK'S INEQUITABLE CONDUCT.

Xiromed's pleading satisfies Rule 9(b) by laying out the specific who, what, when, where, why, and how of the inequitable conduct with particularity. *Exergen*, 575 F.3d at 1329. Although Xiromed was forced to plead some details on information and belief at this stage of the case, "[p]leading on 'information and belief' is permitted under Rule 9(b) when essential information lies uniquely within another party's control" so long as "the pleading sets forth the specific facts upon which the belief is reasonably based." *Id.* at 1330. Xiromed's counterclaim does just that.[2]

### A. "Who" Committed Inequitable Conduct

First, Xiromed identifies "who" from Merck committed inequitable conduct:

> 30. Upon information and belief, the individuals responsible for the inequitable conduct include at least the two named inventors, Harm Veenstra ("Veenstra"), and Wouter De Graaff ("De Graaff"); Counterclaim Defendants/Plaintiffs' attorneys, including at least Susan Hess ("Hess"), Patricia Chisholm ("Chisholm"), and Janet Fair ("Fair"); and other individual(s) employed by Counterclaim Defendants/Plaintiffs who were

---

[2] The timing of Xiromed's amended counterclaim was not a "tactical maneuver," as Merck alleges. (*See* Motion at 1.) It was filed within the deadline to amend pleadings as a matter of course under Rule 15 and almost a year before the deadline to amend pleadings in the Pretrial Scheduling Order (ECF No. 46). Even if leave to amend were required, Rule 15 specifies that such leave should be freely given when justice so requires, as it does here.

responsible for overseeing the prosecution of the '037 Patent. (Counterclaims at ¶ 30.)

Xiromed is aware that inequitable conduct must be committed by individuals, not entities, which is why Xiromed identified specific attorneys and inventors by name. Xiromed also attached the cited Office Actions and Examiner Interview Summary as Exhibits, showing which attorney was responsible for each statement. (*See* Exhibit 5 (Hess); Exhibit 6 (Chisholm); Exhibits 7, 12, 13, and 14 (Fair).) Xiromed expects discovery to show the role that the named inventors played in responding to those Office Actions and Examiner questions as well.

There is evidence that Ms. Fair made statements during an Examiner-initiated interview and amendment that were directly contradicted by the prior art. (Counterclaims at ¶¶ 53-56.) In addition, on information and belief, Dr. De Graaf was aware of the un-disclosed Langer 1990, Schopflin, and other references (which Merck later relied on in the Microspherix IPRs) during prosecution of the '037 patent. (Counterclaims at ¶¶ 44-48, 61-62.) Schopflin and other prior art evidencing the "long history of barium sulfate being added to contraceptive and/or hormone-releasing devices" was specifically cited by Merck's IPR expert, Dr. Langer, as demonstrating both a motivation to combine and a reasonable expectation of success to make a radio-opaque IMPLANON implant. (Counterclaims ¶¶ 44-48, Exhibit 11 at ¶ 137.) In addition, Langer 1990 was cited in an IDS for another patent on which

15

Dr. De Graaf was a named inventor during the same time as prosecution of the '037 patent.  (Counterclaims at ¶ 61; Exhibit 18 at 3.)  Langer 1990 explains that the drug release rate of reservoir devices is controlled by the membrane surrounding the reservoir, such as the membrane included in the '037 patent claims, not the core as Merck's attorneys and named inventors told the USPTO.  (Counterclaims at ¶¶ 60-62).   Further discovery will show even more extensive involvement in the inequitable conduct.[3]  *Fresenius*, 2016 U.S. Dist. LEXIS 128126, at *31 (explaining that at the motion to dismiss stage an allegation that people involved in the patent prosecution knew of the inequitable conduct "meets the relatively low threshold of being a sufficient allegation").

Thus, Xiromed's pleading satisfies the "who" element.

### B.   "What" Claims Were Impacted and "Where" the Material Misrepresentations and Omissions Were Found

Second, Xiromed identifies "what" claims were impacted and "where" the material misrepresentations and omissions were found.  The counterclaims make clear that the inequitable conduct relates to ***all of the claims of the '037 patent***, as

---

[3] Indeed, discovery is already ongoing, and Xiromed has served Unenforceability Contentions further expounding on its inequitable conduct contentions.  While not relevant to consideration of the motion to dismiss, Xiromed attaches the relevant portions of its contentions served on September 17, 2025, should the Court be interested in the continued development of the defense beyond just the Rule 9(b) pleading stage.  (Exhibit A.)  Of course, most of the relevant material remains in Plaintiffs' possession, so further discovery is needed.

the radio-opaque element is in all of them:

32. **Specifically, the Counterclaim Defendants/Plaintiffs took the position during prosecution of the '037 Patent that it would not have been obvious to incorporate a radio-opaque (or "radiopaque") substance into a long-acting contraceptive device for use in a human**.  Then, they took the exact opposite position in a petition for inter partes review ("IPR") of another company's patents.   In light of all the circumstances, the single most reasonable inference to be drawn from Counterclaim Defendants/Plaintiffs' later reversal of position is that they earlier had a specific intent to deceive the USPTO to obtain the '037 Patent.

37. The '037 Patent is generally directed to a radio-opaque etonogestrel implant. As such **the only difference between the claims of the '037 Patent and the prior art IMPLANON device is the inclusion of barium sulfate**, a material that renders the implant radio-opaque, in the core of the etonogestrel implant. . . .

39. These arguments worked, convincing the USPTO to issue the '037 patent. . . . Thus, **in allowing the claims of the '037 Patent, the Examiner specifically noted and relied on the lack of art incorporating radio-opaque material in a hormonal implant**.

44. Notably, when challenging Microspherix's patents, which had earlier priority dates than did the '037 Patent, **Counterclaim Defendants/Plaintiffs, through their expert Dr. Robert Langer, alleged that because barium sulfate was well-known for use as a radiopaque marker for contraceptive implants, it would have been obvious to incorporate barium sulfate as a marker for such a device**:

> *There is a long history of barium sulfate being added to contraceptive and/or hormone-releasing devices to provide another mechanism, in addition to ultrasound and MRI, to locate the device inside a subject's body.* For example, Thiery 2000 refers to the "famous spiral-shaped IUD" Perma-spiral (Gynecoil®) developed in 1960 by Dr. Lazar Marguiles, explaining that "[b]y molding barium sulfate into the plastic the Marguiles spiral was made radio-opaque so that its position could be traced on the X-ray plate." Thiery 2000 (Ex. 1036) at 149. Another IUD, a "T-shaped progesterone-releasing" device called "Progestasert" was introduced in the 1970s. Id. Progestasert was "constructed of a polyethylene short arm" that was "radiolucent" and a hollow vertical

17

long arm" containing "a reservoir of progesterone, together with barium sulfate for radiopacity." Botash 1997 (Ex. 1037) at 374. As Botash notes, ultrasound was the "primary modality employed" for confirming the location of the device, but barium sulfate was added so that a radiograph could be used when the device was "not visualized sonographically." *Id.*; *see also* U.S. Pat. No. 5,788,980 (Ex. 1042) at 4:22-26 (describing estradiol releasing vaginal rings comprising a polymer matrix and "an X-ray contrast medium such as barium sulfate … for identification purposes."). Ex. 11, IPR2018-01288, Exhibit 1002 (Langer Declaration), at ¶ 137 (emphasis added).

45. Plaintiffs adopted and relied on these statements by Dr. Langer in their Petition for Inter Partes Review, citing not only paragraph 137 of Dr. Langer's declaration but other prior art references **to argue that a person of skill in the art would have been motivated to use a radio-opaque marker**:

> Second, a POSA working with De Nijs's disclosure of a cylindrical hormone-eluting implant **would have been motivated to incorporate Schopflin's teaching of including a radiopaque marker because it was known in the art to use radiopaque markers both to allow for precise placement of implants and to track their location within the body**. *Id.*, ¶ 133, 137; Thiery 2000 (Ex. 1036) at 149; Botash 1997 (Ex. 1037) at 374; U.S. Pat. No. Case 2:25-cv-02254-CCC-LDW Document 44 Filed 07/24/25 Page 36 of 49 PageID: 412 37 5,788,980 (Ex. 1042) at 4:22-26. Ex. 17, IPR2018-01288, Petition for Inter Partes Review at 58-59.

47. Furthermore, as noted previously, **the Examiner's Notice of Allowance of the '037 Patent's claims twice noted that de Nijs did not include a radio-opaque material while the two references addressing radio-opaqueness did not involve hormonal contraceptives.** That reason for allowance is directly contradicted by the Langer Declaration submitted by Counterclaim Defendants/Plaintiffs. Langer's cited references, which showed the long history of incorporating a radiopaque component into hormonal implants, **would have provided the link that the Examiner found missing, and thus would have been "but for" material with regard to allowance of the claims.**

55. When allowing the '037 Patent, the USPTO credited Counterclaim Defendants/Plaintiffs' representations regarding the encapsulation of barium sulfate in the polymer matrix, and not within the desogestrel or 3-

ketodesogestrel, as unexpected. Specifically, in the Notice of Allowance, the Examiner stated: "**The claims are allowable over the prior art because the prior art does not teach, disclose nor make obvious a contraceptive implant comprising crystalline desogestrel or 3-ketodesogestrel, a radio-opaque agent substantially encapsulated in a thermoplastic polymer and a non-medicated thermoplastic polymer skin covering the core[sic]**." Ex. 9, August 2, 2013 Notice of Allowance at 2; see also Ex. 8, February 12, 2014 Notice of Allowance at 2.

62. Langer 1990 expressly teaches that while the drug release rate of matrix devices can be impacted by the inclusion of other components, the drug release rate of reservoir devices is controlled by the membrane surrounding the reservoir, **such as the membrane included in the '037 Patent claims**.

68. There is an actual, substantial, continuing, and justiciable controversy between the parties regarding whether **the claims of the '037 Patent** are enforceable.

69. The Xiromed Defendants are entitled to a declaration that **the claims of the '037 Patent** are unenforceable.

The counterclaim also explains "where" the material misrepresentations and omissions were found in the Exhibits, which are considered in their entirety in evaluating the motion to dismiss:

- Exhibit 11, the Langer Declaration in the Microspherix IPRs at ¶ 137, *see generally* ¶¶ 128-140) (Counterclaims at ¶¶ 32, 44-45, 47);

- Exhibit 17, the Petition for *Inter Partes* Review in IPR2018-01288 at 58-59; *see generally* 58-61 (Counterclaims at ¶ 32, 44-45, 47);

- Exhibit 18, the references in an IDS submitted on June 7, 2013 at 3 (Counterclaims at ¶ 54);

- Exhibit 15, Van Laarhoven 2002 at 309, 310 (Counterclaims at ¶¶ 57-58, 63);

- Exhibit 14, Applicant Remarks citing Taghizadeh 2004 and Bonny 1991 at 6-8 (¶¶ 59, 64);

- Exhibit 16, Langer 1990 at 1529 and Fig. 1A and 1B (Counterclaims at ¶¶ 61-62); and

- Exhibit 19, Sam 1992 at 36-37, 39, 40 (Counterclaims at ¶¶ 63-65).

Xiromed's identification of "what" and "where" the inequitable conduct occurred is more than sufficient for the pleadings stage.

## C.    "When" the Material Misrepresentations and Omissions Occurred

Next, Xiromed provides the exact dates that material misrepresentations and omissions occurred, as well as the dates that the Examiner relied upon those misrepresentations and omissions.  These are attached as Exhibits as well:

- Ms. Hess submitted an Amendment on Feb. 3, 2010 (Counterclaims at ¶ 38 & Exhibit 5);

- Ms. Chisholm submitted an Amendment on July 20, 2010 (Counterclaims at ¶¶ 38, 59, 64 & Exhibit 6);

- Ms. Fair submitted an Amendment and Response on Sept. 12, 2012 (Counterclaims at ¶¶ 38, 59 & Exhibit 7);

- The Examiner held an Interview with Ms. Fair on May 29, 2013, with a summary dated June 11, 2013 (Counterclaims at ¶ 53 & Exhibit 13);

- Ms. Fair submitted an IDS and Supplemental Amendment on June 7, 2013 (Counterclaims at ¶¶ 54, 59 & Exhibit 14);

- The Examiner submitted a First Notice of Allowance on Aug. 2, 2013 (Counterclaims at ¶¶ 39, 55 & Exhibit 9);

- Merck's attorneys and named inventors cited Langer 1990 in a separate patent application on Dec. 6, 2013 (Counterclaims at ¶61 & Exhibit 18); and

- The Examiner submitted a Second Notice of Allowance on Feb. 12, 2014 (Counterclaims at ¶¶ 39, 55 & Exhibit 8).

Thus, Xiromed's counterclaim adequately explains "when" the inequitable conduct occurred.

### D. "Why" the Information Is Material and "How" the Examiner Would Have Used It

Finally, Xiromed's counterclaim explains at length why the misrepresented and omitted information was material to patentability and how the Examiner would have used the information to reject the claims. The counterclaim explains exactly what was misrepresented or omitted and how it contradicted what the Examiner thought and was told by the prosecuting attorneys and named inventors:

> 32. **Specifically, the Counterclaim Defendants/Plaintiffs took the position during prosecution of the '037 Patent that it would not have been obvious to incorporate a radio-opaque (or "radiopaque") substance into a long-acting contraceptive device for use in a human**. ***Then, they took the exact opposite position in a petition for inter partes review ("IPR") of another company's patents.*** In light of all the circumstances, the single most reasonable inference to be drawn from Counterclaim Defendants/Plaintiffs' later reversal of position is that they earlier had a specific intent to deceive the USPTO to obtain the '037 Patent.

> 38. **During prosecution of the '037 Patent, the inventors and Organon's attorneys consistently asserted that one skilled in the art would *not* have considered incorporating a radio opaque material in a controlled-release contraceptive device.** . . .

> 39. **These arguments worked, convincing the USPTO to issue the '037 patent.** In the Examiner's Notice of Allowance, the Examiner identified three pieces of prior art, including U.S. Pat. No. 4,957,119 ("de Nijs"), which discloses the IMPLANON implant, but stated that de Nijs' etonogestrel implant did not include radio-opaque material. The Examiner then pointed to two other pieces of art that included radio-opaque material but stated that neither one suggested using radio-opaque material (or particularly barium sulfate) with contraceptive devices. Ex. 8, February 12, 2014 Second Notice of Allowance at 2; Ex. 9, August 2, 2013 First Notice of Allowance at 2. **Thus,**

**in allowing the claims of the '037 Patent, the Examiner specifically noted and relied on the lack of art incorporating radio-opaque material in a hormonal implant.**

44. Notably, when challenging Microspherix's patents, which had earlier priority dates than did the '037 Patent, **Counterclaim Defendants/Plaintiffs, through their expert Dr. Robert Langer, alleged that because barium sulfate was well-known for use as a radiopaque marker for contraceptive implants, it would have been obvious to incorporate barium sulfate as a marker for such a device**:

> ***There is a long history of barium sulfate being added to contraceptive and/or hormone-releasing devices to provide another mechanism, in addition to ultrasound and MRI, to locate the device inside a subject's body.*** For example, Thiery 2000 refers to the "famous spiral-shaped IUD" Perma-spiral (Gynecoil®) developed in 1960 by Dr. Lazar Marguiles, explaining that "[b]y molding barium sulfate into the plastic the Marguiles spiral was made radio-opaque so that its position could be traced on the X-ray plate." Thiery 2000 (Ex. 1036) at 149. Another IUD, a "T-shaped progesterone-releasing" device called "Progestasert" was introduced in the 1970s. Id. Progestasert was "constructed of a polyethylene short arm" that was "radiolucent" and a hollow vertical long arm" containing "a reservoir of progesterone, together with barium sulfate for radiopacity." Botash 1997 (Ex. 1037) at 374. As Botash notes, ultrasound was the "primary modality employed" for confirming the location of the device, but barium sulfate was added so that a radiograph could be used when the device was "not visualized sonographically." *Id.*; *see also* U.S. Pat. No. 5,788,980 (Ex. 1042) at 4:22-26 (describing estradiol releasing vaginal rings comprising a polymer matrix and "an X-ray contrast medium such as barium sulfate … for identification purposes."). Ex. 11, IPR2018-01288, Exhibit 1002 (Langer Declaration), at ¶ 137 (emphasis added).

45. Plaintiffs adopted and relied on these statements by Dr. Langer in their Petition for Inter Partes Review, citing not only paragraph 137 of Dr. Langer's declaration but other prior art references **to argue that a person of skill in the art would have been motivated to use a radio-opaque marker**:

> Second, a POSA working with De Nijs's disclosure of a cylindrical hormone-eluting implant **would have been motivated to incorporate Schopflin's teaching of including a radiopaque marker because it**

22

was known in the art to use radiopaque markers both to allow for precise placement of implants and to track their location within the body. *Id.*, ¶ 133, 137; Thiery 2000 (Ex. 1036) at 149; Botash 1997 (Ex. 1037) at 374; U.S. Pat. No. Case 2:25-cv-02254-CCC-LDW Document 44 Filed 07/24/25 Page 36 of 49 PageID: 412 37 5,788,980 (Ex. 1042) at 4:22-26. Ex. 17, IPR2018-01288, Petition for Inter Partes Review at 58-59.

46. Upon information and belief, **Counterclaim Defendants/Plaintiffs, including their attorneys and the named inventors of the '037 Patent, were aware at the time of prosecution of the '037 Patent of the same material prior art that Counterclaim Defendants/Plaintiffs raised in the Microspherix IPRs, but failed to disclose that art during prosecution** of the '037 Patent in an intent to deceive the USPTO.

47. Furthermore, as noted previously, the Examiner's Notice of Allowance of the '037 Patent's claims twice noted that de Nijs did not include a radio-opaque material while the two references addressing radio-opaqueness did not involve hormonal contraceptives. **That reason for allowance is directly contradicted by the Langer Declaration submitted by Counterclaim Defendants/Plaintiffs. Langer's cited references, which showed the long history of incorporating a radiopaque component into hormonal implants, would have provided the link that the Examiner found missing, and thus would have been "but for" material with regard to allowance of the claims.**

48. Furthermore, upon information and belief, **since Organon's prosecuting attorneys and the inventors of the '037 Patent knew of this "long history" and did not supply that information to the USPTO at any time**, including in their Request for Continuing Examination filed after the Examiner's First Notice of Allowance, **withholding that prior art also constituted an act of egregious misconduct that is material by definition.**

51. *First*, **Counterclaim Defendants/Plaintiffs misrepresented the prior art by stating that it would have been surprising to find barium sulfate encapsulated within the microstructure of the polymer matrix instead of being encapsulated within the crystalline desogestrel or 3-ketodesogestrel during manufacture of the implant rod.** . . .

52. Counterclaim Defendants/Plaintiffs also explained that "Applicants believe that having the percent weight of the thermoplastic polymer be less

than 50% and/or equal to or less than the percent weight of the hormone contributes in allowing the device to demonstrate two unexpected features; (1) prevents the radio-opaque material from leaching out of the device and (2) enables the radio-opaque material to not affect the release rate of the desogestrel or ketodesogestrel as compared to the same device without a radio-opaque material." *Id.* **In this way, Counterclaim Defendants/Plaintiffs intended to deceive the USPTO that there was something surprising about the way barium sulfate could be added to the existing IMPLANON device, leading to unexpected results.**

53. **Upon information and belief, the Examiner of the '037 Patent application did not understand how barium sulfate was incorporated into the implant core, and thus requested, and relied upon, Counterclaim Defendants/Plaintiffs' representations to understand the technology.** Specifically, the Examiner initiated an interview with Counterclaim Defendants/Plaintiffs' attorney Janet Fair, which was conducted on May 29, 2013. Ex. 13, June 11, 2013 Examiner Initiated Interview Summary. In the Examiner's summary of the interview, the Examiner stated, "Examiner called the Attorney to discuss the method of making the claimed X-ray implant. Examiner wanted to know if any of the process steps were critical in order to ensure the encapsulation of the barium sulfate in the polymer…. **Applicant's representative explained that they have more data to demonstrate that those of skill in the art would not have expected the barium sulfate to be encapsulated in the polymer and would have expected it to leach out along with the drug and therefore was unexpected.** Applicant's representative is going to submit the results in a supplemental amendment." *Id.*

55. **When allowing the '037 Patent, the USPTO credited Counterclaim Defendants/Plaintiffs' representations regarding the encapsulation of barium sulfate in the polymer matrix, and not within the desogestrel or 3-ketodesogestrel, as unexpected.** . . .

56. However, upon information and belief, **Counterclaim Defendants/Plaintiffs were aware that in an implant device such as the device claimed by the '037 Patent, the addition of barium sulfate would necessarily be encapsulated by the polymer matrix** and not in the crystalline desogestrel or 3-ketodesogestrel.

59. *Second*, **Counterclaim Defendants/Plaintiffs misrepresented the prior art regarding the effect of barium sulfate on the release rate of desogestrel**

**or 3- ketodesogestrel in the claimed device.** Specifically, Counterclaim Defendants/Plaintiffs asserted in multiple instances that a POSA would reasonably expect that "the incorporation of radio-opaque material into a controlled release contraceptive device would affect the hormone release from the controlled-release contraceptive device." See, e.g., Ex. 6, July 20, 2010 Applicant Remarks at 15-16. **To support these assertions, Counterclaim Defendants/Plaintiffs, through their attorneys, cited references discussing the impact of additional components in <u>matrix</u> devices.** . . .

60. **However, Counterclaim Defendants/Plaintiffs were aware that the implant device claimed by the '037 Patent is a <u>reservoir</u> device**, not a matrix device, and thus the release rate of desogestrel or 3- ketodesogestrel was controlled in a different manner, and not affected, by the presence of barium sulfate in the core. **Thus, Counterclaim Defendants/Plaintiffs relied on prior art relating to different, unrelated delivery systems to mislead the USPTO regarding the impact of barium sulfate on the claimed delivery system**.

65. Contrary to Counterclaim Defendants/Plaintiffs' representations to the USPTO regarding the potential impact of barium sulfate on the drug release rate from matrix devices and the membrane of a reservoir device, **Counterclaim Defendants/Plaintiffs were aware that there is a long history of barium sulfate being used in hormone-releasing reservoir devices with little to no effect on the release rate**. For example, Counterclaim Defendants/Plaintiffs were aware that Sam 1992 disclosed that PROTAGESTERT, a reservoir device that had been commercially marketed since 1976, incorporated both progesterone and barium sulfate in the reservoir core without impact to the rate of release of progesterone. Ex. 19, Sam 1992 at 36-37. **Counterclaim Defendants/Plaintiffs did not direct the Examiner's attention to this section of Sam 1992, however, and instead misled the Examiner by pointing to the discussion of silicon dioxide in the membrane of NORPLANT.**

66. **But for the intentional misrepresentations of the prior art by Counterclaim Defendants/Plaintiffs to the USPTO, the '037 Patent would not have been allowed.**

Exhibit 11, Langer Declaration at ¶ 133: "Second, **a POSA working with De Nijs's disclosure of a hormone-eluting implant would have been motivated to incorporate the teaching of Schopflin to include a radiopaque marker because it was known in the prior art to use**

**radiopaque markers to allow for precise placement of implants for localized treatment and to track their location within the body**. Zamora at 12:20-25 ("It is frequently desirable to be able to verify the exact location of the devices of this invention within the tumor of the patient."); *see also* Thomsen 1985 at 224-25."

Exhibit 11, Langer Declaration at ¶ 138: **"In light of these teachings, a POSA would have been motivated to include a x-ray visible radiopaque material such as barium sulfate, as taught in Schopflin, to provide another mechanism for locating the implant within the subject's body when the implant was not readily palpable. As discussed above at Section VIII, radiopaque markers had been used to make implants visible by common imaging techniques in the art."**

Exhibit 11, Langer Declaration at ¶ 139: "*A POSA would also have had a reasonable expectation that the teachings of De Nijs and Schopflin could be successfully combined because they disclose implants with features that overlap heavily*. De Nijs and Schopflin both teach cylindrical implants about 1.5 mm in diameter and 1 to 4 cm in length. *Compare* De Nijs at 1:62-67, 2:18-22 *with* Schopflin 9:4-22 (Example 3), 9:24-39 (Example 4) (describing cylindrical implants "of a length of 20 mm and a diameter of 1.5 mm"). Both teach the use of contraceptive hormones as the drug inside the implant. *Compare* De Nijs at 2:3-29 *with* Schopflin at 5:54-6:13. Both teach the use of a polymeric coating to cover the implant. *Compare* De Nijs at 1:34-36, 2:3-20, 3:34-36 *with* Schopflin at 1:21-26, 7:2-4. *Given the substantial overlap, a POSA would have an expectation that these references could be successfully combined to create a radiopaque device.*"

Exhibit 17, IPR Petition at 60: **"Because Schopflin teaches that a radiopaque marker can successfully be incorporated into a similarly designed drug-releasing contraceptive implant, a POSA would have an expectation that radiopaque marker of Schopflin could be successfully combined with the De Nijs implant."**

As shown above, Xiromed's counterclaims specify with particularity what information was withheld from—or misrepresented to—the Examiner, "why" it was material, and "how" that would have influenced prosecution if known by the Examiner. Perhaps most significantly, Merck's motion to dismiss never contests the

obviousness of the '037 patent's claims over the combination of De Nijs and Schopflin relied on by Dr. Langer and Merck's IPR petition. Indeed, Merck's brief completely ignores Schopflin despite making it front and center in its IPR arguments. For the above reasons alone, Merck's motion should be denied.

## II.    MERCK'S COUNTERARGUMENTS GO TO THE MERITS OF XIROMED'S INEQUITABLE CONDUCT COUNTERCLAIM, NOT THE SUFFICIENCY OF XIROMED'S PLEADING.

Merck makes several additional arguments in its Motion to Dismiss, but they all go to the merits of the counterclaim, not the pleading. "A factual disagreement cannot support dismissal of [Xiromed's] counterclaim at the pleading stage." *Depomed*, 2017 WL 2804953 at *6. "In evaluating the sufficiency of a counterclaim, district courts must separate the factual and legal elements. *American Regent*, 2025 WL 2318989, at *5. "A court must accept all of the counterclaim's well pleaded facts as true and give a defendant the benefit of all reasonable inferences flowing therefrom." *Id.* (citation, internal quotations, and brackets omitted).

For example, Merck argues that the prior art Xiromed relies on was cumulative. Merck says that the Examiner was "well aware of prior-art contraceptives containing radio-opaque materials based on references specifically discussed in the prosecution record (at least Gould and Sam 1992)." (Motion at 10.) Nowhere in Merck's brief, however, does it address the withheld Schopflin reference specifically noted and relied upon by its expert Dr. Langer and identified in the

27

counterclaims. (Counterclaims at ¶ 45.) Merck did not offer such an argument because it cannot do so in good conscience. Dr. Langer and Merck itself both asserted that De Nijs and Schopflin would have motivated a POSA to make a radiopaque version of De Nijs's implant and would have had a reasonable expectation of success in doing so. The withheld Schopflin reference clearly is not cumulative.

Additionally, the counterclaims explain how, even when art such as Sam 1992 was before the Examiner, Merck's attorneys and named inventors misrepresented it. (*See, e.g.*, Counterclaims at ¶65.) The Examiner's knowledge of a reference does not excuse an attorney making representations about it. *See Luv N' Care, Ltd. v. Laurain*, 98 F.4th 1081, 1097-98 (Fed. Cir. 2024) (holding that even prior art disclosed to the USPTO can be but-for material if is mischaracterized or described falsely to the USPTO); *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1190 (Fed. Cir. 2014) (holding that "[p]artial disclosure of material information about the prior art to the PTO cannot absolve a patentee of intent if the disclosure is intentionally selective"); *Apotex, Inc. v. UCB, Inc.*, 763 F.3d. 1354, 1362 (Fed. Cir. 2014) (finding deceptive intent based on misrepresentation of material facts).

Merck also alleges the Xiromed is "comparing apples to oranges" in discussing the Microspherix IPR because that patent's claims were broader and involved contraceptive beyond just implants. (Motion at 12.) Merck states that:

"[i]n reality, the sources Organon [in the IPR and now by Xiromed] cited all dealt with the use of radio-opaque material in *IUDS and vaginal rings.*" and

"[n]either the Langer Declaration nor the references he relied upon dealt with birth control implants such as NEXPLANON®, and Xiromed cites no other references that do."

*Id.* at 23 (emphasis in original).

That is false. ***Merck's own attorneys in the IPR characterized these statements as relating to "implants."***

First, Dr. Langer specifically stated that Schopflin—the withheld prior art ignored in Merck's brief and cited in Paragraph 45 of the Counterclaims—disclosed implants that were remarkably similar to those of De Nijs.

> 139. ***A POSA would also have had a reasonable expectation that the teachings of De Nijs and Schopflin could be successfully combined because they disclose implants with features that overlap heavily. De Nijs and Schopflin both teach cylindrical implants about 1.5 mm in diameter and 1 to 4 cm in length.*** Compare De Nijs at 1:62-67, 2:18-22 with Schopflin 9:4-22 (Example 3), 9:24-39 (Example 4) (describing cylindrical implants "of a length of 20 mm and a diameter of 1.5 mm"). ***Both teach*** the use of contraceptive hormones as the drug ***inside the implant***. Compare De Nijs at 2:3-29 with Schopflin at 5:54-6:13. ***Both teach*** the use of a polymeric coating to ***cover the implant***. Compare De Nijs at 1:34-36, 2:3- 20, 3:34-36 with Schopflin at 1:21-26, 7:2-4. ***Given the substantial overlap***, a POSA would have an expectation that these references could be successfully combined to create a radiopaque device.

(Exhibit 11 at ¶ 139) (emphasis added).  Merck relied on this very assertion in its Petition, arguing that Schopflin teaches addition of a radio-opaque marker into a "contraceptive implant":

> Because Schopflin teaches that a radiopaque marker can successfully be incorporated ***into a similarly-designed drug-releasing contraceptive implant***, a POSA would have an expectation that radiopaque marker of Schopflin [e.g. barium sulfate] could be successfully combined with the De Nijs implant [e.g. IMPLANON]."

(Exhibit 17 at 60) (emphasis added). Xiromed's counterclaims specifically drew attention to Schopflin and Merck's allegation that there would have been a motivation to include a radio-opaque marker in De Nijs:

> Second, a POSA working with De Nijs's disclosure of a cylindrical hormone-eluting implant ***would have been motivated to incorporate Schopflin's teaching of including a radiopaque marker because it was known in the art to use radiopaque markers*** both to allow for precise placement of ***implants*** and to track their location within the body. *Id.*, [Langer Declaration] ¶ 133, 137; Thiery 2000 (Ex. 1036) at 149; Botash 1997 (Ex. 1037) at 374; U.S. Pat. No. 5,788,980 (Ex. 1042) at 4:22-26.

(Counterclaims at ¶ 45) (emphasis added.)

Second, ¶ 133 of the Langer Declaration, cited in the Counterclaims at ¶ 145 cited above, specifically says that a POSA would have been motivated to combine De Nijs and Schopflin "***for precise placement <u>of implants</u>***":

> 133. Second, ***a POSA working with De Nijs's disclosure of a hormone-eluting implant would have been motivated to incorporate the teaching of Schopflin to include a radiopaque marker because it was known in the prior art to use radiopaque markers to allow for precise placement <u>of implants</u> for localized treatment and to track their location within the body***. Zamora at 12:20-25 ("It is frequently desirable to be able to verify the exact location of the devices of this invention within the tumor of the patient."); *see also* Thomsen 1985 at 224-25.

Thus, it is at best disingenuous and at most misleading for Merck to say in its brief to this Court that the Langer Declaration, Thierry 2000, Botash 1997, and U.S.

Patent No. 5,788,980 do not relate to contraceptive "implants" because they relate to IUDs.  (Motion at 23.)  The paragraphs above show that (i) if Merck's brief is intended to indicate that Schopflin is directed only to IUDs and vaginal rings, it is inconsistent with Merck's previous arguments; and (ii) ***Merck itself*** cited the other references as relating to "implants" during the IPR.  (Counterclaims at ¶¶ 44-45.) This also goes to show that the references are not cumulative, as Merck also argues. (Motion at 22.)

Next, Merck asks the Court to evaluate for itself how "Xiromed's Allegations" stack up against the "Examiner's Record" and decide at this stage that the misrepresentations and omissions are not material.  (Motion at 25-26, Table 1.)  The same is true with Merck requesting the Court to analyze the "Differences between the '037 (Organon) and '193 (Microspherix) Patents."  (Motion at 36-37, Table 2.) However, that is simply not the Court's role at this point.  Rather, the Court "must accept all of the counterclaim's well pleaded facts as true and give [Xiromed] the benefit of all reasonable inferences flowing therefrom." *American Regent*, 2025 WL 2318989, at *5.

Here, Xiromed's Amended Counterclaims and attached Counterclaim Exhibits have explained with particularity why Merck's attorneys' and named inventors' misrepresentations and omissions were material and directly impacted prosecution. Xiromed has also explained how Merck itself characterized the art during the

Microspherix IPR, which is far different than its attorneys and named inventors characterized the art during the '037 patent's prosecution.

Xiromed's pleading also alleges but-for materiality based on Merck's prior art misrepresentations. The Examiner granted the patent because she believed, based on Merck's misrepresentations and misleading disclosure of prior art, that the addition of barium sulfate to the core not affecting the release rate was unexpected. (Counterclaims at ¶¶ 39, 55.) But for Merck's misrepresentations, the application would not have been allowed. (*Id.*) Therefore, Merck's misrepresentations are "but for" material. *Luv N' Care*, 98 F.4th at 1097-98; *Am. Calcar,* 768 F.3d at 1189.

Also, the same pattern of conduct shows deceptive intent. As the Federal Circuit has explained, even "[a]cts which are not 'per se unreasonable when considered in isolation' may still demonstrate 'repeated attempts to avoid playing fair and square with the patent system' and, collectively, support a finding of deceptive intent. *Luv N' Care,* 98 F.4th at 1098 (citation omitted). Here, Xiromed has more than adequately explained how Merck's attorneys and named inventors were not "playing fair and square" with the Examiner during prosecution. Moreover, the whole purpose of pleading with particularity is to put Merck on notice of Xiromed's allegations, which Xiromed has done with the pleading itself and the since-provided detailed contentions of unenforceability. Thus, Xiromed's counterclaim satisfies the pleading standard and Merck's motion should be dismissed.

32

### III.    MERCK'S MISREPRESENTATION'S ABOUT THE PRIOR ART ARE NOT MERE "ATTORNEY ARGUMENT" AND SUPPORT AN INEQUITABLE CONDUCT CLAIM.

Courts have held that statements from an attorney during patent prosecution that constituted a breach of the duty of candor can constitute inequitable conduct. *Enzo Life Sciences, Inc. v. Digene Corp.*, 270 F. Supp. 2d 484, 489 (D. Del. 2003); *Nilssen v. Osram Sylvania, Inc.,* 504 F.3d 1223, 1229 (Fed. Cir. 2007); *Luv N' Care,* 98 F.4th at 1093.  This duty of candor means that prosecuting attorneys and inventors cannot affirmatively misrepresent facts, fail to disclose material information, or submit false information with an intent to deceive. *Nilssen*, 504 F.3d at 1229.

In *Luv N' Care, Ltd.*, the patent agent and the inventor said that a piece of prior art did not exhibit a certain functionality when they were aware that it did. *Luv N' Care, Ltd.*, 98 F.4th at 1093.  The court held that, even though the inventor and patent agent disclosed the reference to USPTO, they could still have committed inequitable conduct if the patentability decision would have differed if the reference had been disclosed accurately.  *Id.* at 1097-98.

Likewise, Xiromed alleges that Merck's inventors and attorneys were aware of prior art that disclosed it is the membrane in reservoir devices that controls the release rate, not the core, and they omitted and misrepresented references to keep that hidden from the Examiner.  (Counterclaims at ¶ 65.)  Also, the alleged

33

omissions and misrepresentations directly had an impact on the patentability determination based on the Examiner's statement in the Notice of Allowance that it was unexpected for barium sulfate to not affect the release rate. (Counterclaims at ¶ 55.) At this stage, this Court must accept all of Xiromed's allegations as true. Under this applicable standard, Merck's attorneys' and named inventors' statements constitute material misrepresentations, and the patent is unenforceable for inequitable conduct.

In the *Enzo Life Sciences, Inc.* case, Digene alleged that the inventors of the patent made several material misrepresentations to the USPTO, including misrepresentations about what the prior art disclosed or taught. *Enzo Life Sciences*, 270 F. Supp. 2d at 490. The court held that, given the allegations of mischaracterizing and withholding prior art, Digene had good cause to amend its pleadings to allege inequitable conduct. *Id.* Similarly, Xiromed alleged that the attorneys and inventors of the '037 patent made several misrepresentations about what the prior art disclosed or taught to the USPTO. (Counterclaims at ¶ 31.) Therefore, the Court should likewise hold that Xiromed's claim should survive the pleadings stage.

In one of the cases that Merck repeatedly cites (Motion at 19, 28, 29, 33), *Warner Chilcott Co., LLC v. Amneal Pharms., LLC*, No. 11-5989 (FSH), 2013 WL 6627694 (D.N.J. Dec. 20, 2013), the Court explained that when a patent

applicant makes statements about industry-specific information that the applicant is "uniquely qualified to characterize and explain" and the Examiner relies on the applicant's representations, then a court can find a material misrepresentation. *Id.* at *8.

In this case, the subject matter of the '037 patent is highly technical, so the inventors and prosecutors of the application were uniquely qualified to explain and disclose the relevant prior art. Furthermore, the Examiner ***specifically requested*** clarification from Merck's attorneys and named inventors regarding the release rate of barium sulfate in reservoir devices. (Counterclaims at ¶¶ 53-56.) Here, there was both industry-specific knowledge and reliance, which means there was a material misrepresentation. *Id.*

Merck also cited *Catalyst Pharms., Inc. v. Jacobus Pharms. Co.*, No. 20-14590 (MAS/DEA), 2022 WL 22897850 (D.N.J. May 26, 2022) to argue that attorney interpretation of a prior art reference cannot be used for an inequitable conduct claim. But *Catalyst* says that an attorney's interpretation of a prior art reference ***can*** be used for an inequitable conduct claim if the attorney's arguments are "'gross mischaracterizations or unreasonable interpretations of the prior art' and are . . . 'demonstrably false.'" *Catalyst*, 2022 WL 22897850 at *6 (citing *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1349 (Fed. Cir. 2007).

In this case, Merck's misrepresentations that a POSA would not have been

motivated to use barium sulfate in contraceptives implants, and that a POSA would not have expected success with this combination but instead would have expected the barium to cause toxicity, were directly contradicted by Merck's contentions in different proceedings before the Patent Office. This glaring about-face constituted unreasonable interpretations and gross mischaracterizations of the prior art. (Counterclaims at ¶¶ 32, 38, 44-48, 65.) As indicated by Merck's position in the Microspherix IPR and the Langer Declaration, it was **widely known** that barium sulfate could be used in contraceptives. (Counterclaims at ¶¶ 44-45, 47.) Furthermore, as indicated by Sam 1992 and Langer 1990, both of which were known by Merck's attorneys and named inventors, the **membrane** of a reservoir device, not the core, controls the rate of diffusion and hence controls the amount of leakage. (Counterclaims at ¶¶ 60-62, 65.) Therefore, Merck's attorneys' and named inventors' positions were unreasonable and mischaracterized the prior art. Those representations were also demonstrably false. Langer 1990, Sam 1992, and the Langer Declaration all make clear that the addition of barium sulfate to a reservoir device not causing leakage and being used as a contraceptive was **an expected use and result** in the art. (Counterclaims at ¶¶ 44, 60-62, 65.) Merck's attorneys' and named inventors' position in the prosecution that such use and result was unexpected, therefore, is not an accurate depiction of the state of the art at the time of the '037 patent. (Counterclaims at

36

¶¶ 32, 38, 65.)

Contrary to what Merck says, patent applicants are not "entitled to present the strongest case in their favor" and let the Examiner feel "free to reach his own conclusions" (Motion at 27) by making material misrepresentations or omissions. Here, Merck's attorneys and named inventors misrepresented the teachings of prior art and misleadingly omitted prior art, and courts have regularly granted inequitable conduct claims on those grounds. *Nilssen,* 504 F.3d at 1234-35 (holding that undisclosed prior art was material to patentability because a person of ordinary skill would apply the teachings of the prior art to the patent and finding intent because the prior art was repeatedly cited in other patent applications by the applicant); *Semiconductor Energy Lab'y Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1374-76 (Fed. Cir. 2000) (holding that there was intent to deceive where patent applicant only provided part of the prior art reference to the Examiner excluding material information, giving the Examiner the impression that the reference was less relevant than it was; further finding that the partially disclosed reference was material to patentability since expert said that it would have provided a blueprint to creating the invention); *Am. Calcar*, 768 F.3d at 1187 (holding that limited disclosure of prior art in the patent specification and prosecution that omitted material information about the prior art can cause a court to infer deceptive intent and find inequitable conduct);

37

*Fresenius*, 2016 U.S. Dist. LEXIS 128126, at *31 (holding that where patent applicants disclosed prior art that was beneficial to showing that their invention was patentable but allegedly omitted prior art showing that their invention was not patentable there could be a claim for inequitable conduct).

For these additional reasons, Merck's motion should be denied.

## CONCLUSION

For the reasons discussed above, Xiromed respectfully requests that the Court deny Merck's motion to dismiss. If the Court were to grant Merck's motion, it should do so without prejudice to Xiromed amending its counterclaims after further discovery and a response to its contentions.

Dated: September 22, 2025

Respectfully submitted,

By: s/ *Eric I. Abraham*
Eric I. Abraham
Kristine L. Butler
**HILL WALLACK LLP**
21 Roszel Road
Princeton, New Jersey 08543-5226
(609) 734-6358

*Attorneys for Defendants*
*Xiromed Pharma España, S.L. and*
*Xiromed, LLC*

*Of Counsel:*
Robert Cerwinski (*pro hac vice to be filed)*
(rcerwinski@geminilaw.com)
C. Kyle Musgrove (*admitted pro hac vice)*
(kmusgove@geminilaw.com)

Heather M. Schneider (*admitted pro hac vice*) (hschneider@geminilaw.com)
Cindy Chang (*admitted pro hac vice*) (cchang@geminilaw.com)
Jason Zaccaro (*admitted pro hac vice*) (jzaccaro@geminilaw.com)
Julia Schur (*admitted pro hac vice*) (jschur@geminilaw.com)
**GEMINI LAW LLP**
32 W 39th Street
New York, NY 10018

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 22, 2025, I caused Defendants'

Opposition to Plaintiffs' Motion to Dismiss Counterclaim and Strike Affirmative

Defense of Inequitable Conduct to be served on counsel for Plaintiffs by notice of

electronic filing and via email.

Dated:  September 22, 2025                    Respectfully submitted,

By:  <u>*s/ Eric I. Abraham*</u>
Eric I. Abraham

40